UNITED STATES COURT OF APPEALS
FOR THE THIRD CIRCUIT

_____

No. 21-1832
_____

MADISON M. LARA; SOPHIA KNEPLEY: LOGAN D. MILLER: SECOND
AMENDMENT FOUNDATION, INC; FIREARMS POLICY COALITION

v.

COMMISSIONER PENNSYLVANIA STATE POLICE
_____

District Court no. 2:20-cv-01582
_____

SUR PETITION FOR REHEARING
_____

Present: CHAGARES, <u>Chief Judge</u>, HARDIMAN, SHWARTZ, KRAUSE,
RESTREPO, BIBAS, PORTER, MATEY, PHIPPS, FREEMAN,
MONTGOMERY-REEVES, CHUNG, and SMITH[*], <u>Circuit Judges</u>[†]


      The petition for rehearing filed by appellant in the above-entitled case having been submitted to the judges who participated in the decision of this Court and to all the other available circuit judges of the circuit in regular active service, and no judge who concurred in the decision having asked for rehearing, and a majority of the judges of the circuit in regular service not having voted for rehearing, the petition for rehearing by the panel and the Court en banc, is denied. Judge Restrepo, Judge Shwartz, Judge Krause, Judge Montgomery-Reeves, and

---

[*] The vote of the Honorable D. Brooks Smith, Senior Judge of the United States Court of Appeals for the Third Circuit, is limited to panel rehearing.

[†] The Honorable Kent A. Jordan was a member of the merits panel. Judge Jordan retired from the Court on January 15, 2025, and did not participate in the consideration of the petition for rehearing.

Judge Chung voted to grant the petition for rehearing. Judge Krause would have granted rehearing and files the attached dissent sur denial of rehearing en banc.

BY THE COURT,

s/D. Brooks Smith
Circuit Judge

Dated: February 26, 2025
Lmr/cc: All Counsel of Record

KRAUSE, *Circuit Judge*, dissenting sur denial of rehearing *en banc*.

When they ratified the Second Amendment, our Founders did not intend to bind the nation in a straitjacket of 18th-century legislation, nor did they mean to prevent future generations from protecting themselves against gun violence more rampant and destructive than the Founders could have possibly imagined. It thus stands to reason that the states' understanding of the Second Amendment at the time of the "Second Founding"[1]—the moment in 1868 when they incorporated the Bill of Rights against themselves—is part of "the Nation's historical tradition of firearms regulation"[2] informing the constitutionality of modern-day regulations. Today, we acknowledge as much, with both the panel majority and dissent recognizing that "laws 'through the end of the 19th century' . . . can be 'a critical tool of constitutional interpretation' because they can be evidence of a historical tradition and shed important light on the meaning of the Amendment as it was originally understood."[3]

---

[1] *See, e.g.*, Eric Foner, *The Second Founding: How The Civil War and Reconstruction Remade The Constitution* (2019); *see also Students for Fair Admissions, Inc. v. President & Fellows of Harvard Coll.*, 600 U.S. 181, 220 (2023) (referring to the incorporation of the Bill of Rights as "a Second Founding").

[2] *United States v. Rahimi*, 602 U.S. 680, 692 n.1 (2024) (quoting *N.Y. State Rifle & Pistol Ass'n v. Bruen*, 597 U.S. 1, 37 (2022)).

[3] *Lara v. Comm'r Pa. State Police*, 125 F.4th 428, 441 (3d Cir. 2025) (*Lara II*) (cleaned up) (quoting *Bruen*, 597 U.S. at 35); *accord id*. at 453–54 (Restrepo, J., dissenting).

Indeed, since the Supreme Court tethered the Second Amendment's meaning to historical precedent in *District of Columbia v. Heller*, 554 U.S. 570 (2008), it has relied on 19th-century sources in each of its recent major opinions on the right to bear arms.[4] Accordingly, even as the Supreme Court has acknowledged the "ongoing scholarly debate" about their relevance,[5] we and the other Courts of Appeals have consistently looked to 19th-century, as well as Founding-era sources.[6]

Yet despite acknowledging that "postenactment history can be an important tool,"[7] the panel majority then held—based exclusively on a handful of 18th-century militia laws and without regard to the voluminous support the statutory scheme finds in 19th-century analogues—that Pennsylvania's prohibition on 18-to-20-year-old youth carrying firearms in public during statewide emergencies is unconstitutional.[8]

---

[4] *See District of Columbia v. Heller*, 554 U.S. 570, 605 (2008); *McDonald v. City of Chicago*, 561 U.S. 742, 778 (2010) (plurality); *Bruen*, 597 U.S. at 50–70; *Rahimi*, 602 U.S. at 694–98.

[5] *Bruen*, 597 U.S. at 34.

[6] *See, e.g.*, *United States v. Quailes*, 126 F.4th 215, 222 & n.8 (3d Cir. 2025); *United States v. Moore*, 111 F.4th 266, 271 (3d Cir. 2024); *Wolford v. Lopez*, 116 F.4th 959, 980 (9th Cir. 2024); *Antonyuk v. James*, 120 F.4th 941, 947 (2d Cir. 2024); *Hanson v. District of Columbia*, 120 F.4th 223, 236–40 (D.C. Cir. 2024).

[7] *Rahimi*, 602 U.S. at 738 (Barrett, J., concurring).

[8] *Lara II*, 125 F.4th at 431–32 (discussing Sections 6106, 6107, and 6109 of Pennsylvania's Uniform Firearms Act of 1995, 18 Pa. Cons. Stat. §§ 6101–6128 (2024)).

The panel majority was incorrect, repeating the same error it made the last time around.[9] Under a correct reading of the extensive historical record and a faithful application of the Supreme Court's decisions in *Bruen* and *Rahimi*, Pennsylvania's statute passes constitutional muster. And instead of granting *en banc* rehearing, our Court compounds its error by denying Pennsylvania's petition outright once again.

I respectfully dissent from that denial for four reasons. First, *en banc* review is necessary to correct the panel majority's most basic error: Founding-era sources conclusively demonstrate that legislatures were authorized to categorically disarm groups they reasonably judged to pose a particular risk of danger, and Pennsylvania's modern-day judgment that youth under the age of 21 pose such a risk is well supported by evidence subject to judicial notice. Second, in light of this historical tradition at the Founding, *en banc* review would allow us to apply the proper historical methodology and consider the myriad laws throughout the 19th century that reflect a continuation of this Founding-era tradition, further bolstering the constitutionality of Pennsylvania's law. Third, even if this overwhelming historical evidence were not enough, *en banc* review would permit us to vacate and remand this case to give Pennsylvania the opportunity to marshal historical support before the District Court in light of recent developments in our Second Amendment jurisprudence. And fourth, the majority gives short shrift to the Supreme Court's admonition that "cases implicating unprecedented societal

---

[9] *See Lara v. Comm'r Pa. State Police*, 97 F.4th 156, 157–58 (3d Cir. 2024) (Krause, J., dissenting sur denial of rehearing en banc).

3

concerns or dramatic technological changes may require a more nuanced approach."[10] For each of these reasons, discussed in turn below, *en banc* review should be granted.

### A. *En banc* Consideration Is Necessary to Correct the Panel Majority's Mistaken Interpretation of Founding-Era Evidence.

Pennsylvania's statutory scheme enjoys ample support in Founding-era history to which we look for a match "in principle, not with precision." *Range v. Att'y Gen.*, 124 F.4th 218, 250 (3d Cir. 2024) (*Range II*) (Krause, J., concurring in the judgment). The panel majority failed to recognize this history. That error alone warrants *en banc* review.

It is by now well established that, as then-Judge Barrett put it, "founding-era legislatures categorically disarmed groups whom they judged to be a threat to the public safety." *Kanter v. Barr*, 919 F.3d 437, 458 (7th Cir. 2019) (Barrett, J., dissenting), *abrogated by Bruen*, 597 U.S. 1. And it was the legislatures of the Founding generation that determined—consistent with the Second Amendment—which groups posed sufficient risk to justify categorical disarmament. *See Range II*, 124 F.4th at 255–67 (Krause, J., concurring in the judgment) (cataloguing the historical disarmament of groups that legislatures judged untrustworthy to follow the law); *id.* at 293 (Shwartz, J., dissenting) ("[U]nder *Bruen*, the relevant inquiry is why a given regulation, such as a ban based on one's status, was enacted and how that regulation was implemented.").

---

[10] *Bruen*, 597 U.S. at 27.

4

Pennsylvania exercised such legislative judgment when it decided that those under 21 categorically pose a danger to public safety during times of emergency, and its judgment is entitled to deference—at least where, as here, it is supported by evidence. Modern crime statistics, of which we can take judicial notice,[11] confirm that youth under 21 commit violent gun crimes at a far disproportionate rate. In 2019, for example, although 18- to 20-year-olds made up less than 4% of the U.S. population, they accounted for more than 15% of all homicide and manslaughter arrests.[12] National data collected by the Federal Bureau of Investigation (FBI) also confirms that homicide rates peak between the ages of 18 and 20.[13] Indeed,

---

[11] Several of the sources that follow are drawn from the District Court record, while others may be considered under Federal Rule of Evidence 201. *See, e.g.*, *Clark v. Governor of N.J.*, 53 F.4th 769, 774 (3d Cir. 2022) (taking judicial notice of publicly available statistics); *Stone v. High Mountain Mining Co., LLC*, 89 F.4th 1246, 1261 n.7 (10th Cir. 2024) (same); *United States v. United Bhd. of Carpenters and Joiners of America, Loc. 169*, 457 F.2d 210, 214 n.7 (7th Cir. 1972) (taking judicial notice of statistics from United States Bureau of Census Reports).

[12] *See* U.S. Dep't of Just., Crime in the United States, Arrests, by Age, 2019, at Table 38, https://ucr.fbi.gov/crime-in-the-u.s/2019/crime-in-the-u.s.-2019/topic-pages/tables/table-38; U.S. Census Bureau, Age and Sex Composition in the United States: 2019, at Table 1, National Population by Characteristics: 2010- 2019, https://www.census.gov/data/tables/2019/demo/age-and-sex/2019-age-sex-composition.html.

[13] *See* Daniel W. Webster et al., *The Case for Gun Policy Reforms in America*, Johns Hopkins Ctr. for Gun Policy & Research 5 (last updated Feb. 5, 2014),

5

that age group commits gun homicides at a rate three times higher than adults aged 21 or older.[14] And "[a]dditional studies show that at least one in eight victims of mass shootings from 1992 to 2018 were killed by an 18 to 20-year-old[.]"[15]

Our understanding of *why* youth commit violent crimes has also evolved dramatically in recent decades, reinforcing Pennsylvania's legislative judgment that young people pose a

---

http://web.archive.org/web/20160325061021/http:/www.jhsph.edu/research/centers-and-institutes/johns-hopkins-center-for-gun-policy-and-research/publications/WhitePaper020514_CaseforGunPolicyReforms.pdf.

[14] Everytown Research & Policy, Everytown for Gun Safety (last updated Mar. 1, 2022), https://everytownresearch.org/stat/eighteen-to-20-year-olds-commit-gun-homicides-at-a-rate-triple-the-rate-of-those-21-and-years-older/; *see also Jones v. Bonta*, 34 F.4th 704, 760 (9th Cir. 2022) (Stein, J., dissenting in part) (noting that 18- to 20-year-olds "commit gun homicides at a rate three times higher than adults above the age of 21"), *vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022); *Hirschfeld v. Bureau of Alcohol, Firearms, Tobacco & Explosives*, 5 F.4th 407, 478 (4th Cir. 2021) (Wynn, J., dissenting) (noting that "from 2013 to 2017, young adults aged 18 to 20 committed gun homicides at a rate *nearly four times higher* than adults 21 and older" (cleaned up)), *vacated as moot*, 14 F.4th 322 (4th Cir. 2021).

[15] *Jones*, 34 F.4th at 760 (Stein, J., dissenting in part) (citing Joshua D. Brown and Amie J. Goodin, *Mass Casualty Shooting Venues, Types of Firearms, and Age of Perpetrators in the United States, 1982–2018*, 108 Am. J. Pub. Health 1385, 1386 (2018)).

particular danger in carrying firearms during states of emergency. We now understand, for example, that those under 21 are uniquely predisposed to impulsive, reckless behavior because their brains have not yet fully developed.[16] Specifically, the prefrontal cortex, which is responsible for impulse control and judgment, is the last part of the brain to fully mature and continues to develop until a person is in their mid-20s.[17] By contrast, the limbic system, which controls emotions like fear, anger, and pleasure, develops far earlier, and young people generally rely heavily on this region of their brains to guide their decision-making.[18]

---

[16] *See also Nat'l Rifle Ass'n of America, Inc. v. Bureau of Alcohol, Tobacco, Firearms, & Explosives*, 700 F.3d 135, 210 n. 21 (5th Cir. 2012) ("[M]odern scientific research supports the commonsense notion that 18-to-20-year-olds tend to be more impulsive than young adults aged 21 and over."), *abrogated on other grounds by Bruen*, 597 U.S. 1; *Horsley v. Trame*, 808 F.3d 1126, 1133 (7th Cir. 2015) ("The evidence now is strong that the brain does not cease to mature until the early 20s in those relevant parts that govern impulsivity, judgment, planning for the future, foresight of consequences, and other characteristics that make people morally culpable.") (citation omitted).

[17] *See, e.g.*, Mariam Arain et al*., Maturation of the Adolescent Brain*, 9 Neuropsychiatric Disease & Treatment 449, 453, 456 (2013); Elizabeth R. Sowell et al., *In Vivo Evidence for Post-adolescent Brain Maturation in Frontal and Striatal Regions*, 2 Nature Neuroscience 859, 859–60 (1999).

[18] Arain, *supra* note 17, at 453.

As a result, young adults are both uniquely prone to negative emotional states[19] *and* uniquely unable to moderate their emotional impulses. Indeed, while "a 19-year-old might possess a brain that looks 'adult-like' and that supports mature cognitive performance under calm or 'neutral' conditions, that same brain tends to look much more like that of a younger kid when evocative emotions are triggered, resulting in significantly weaker cognitive performance."[20] Unsurprisingly, this combination makes young adults especially prone to reckless and violent behavior.[21]

While the scarcity and limited lethality of their weapons gave our Founding generation little reason to fear the danger of youth gun violence, today's legislatures have good reason to do so. And because that group is especially prone to impulsive,

---

[19] Leah H. Somerville et al., *A Time of Change: Behavioral and Neural Correlates of Adolescent Sensitivity to Appetitive and Aversive Environmental Cues*, 72 Brain & Cognition 124, 125 (2010).

[20] *Hirschfeld*, 5 F.4th at 476 (Wynn, J., dissenting) (quoting Jason Chein, *Adolescent Brain Immaturity Makes Pending Execution Inappropriate*, Bloomberg Law (Sept. 17, 2020, 4:00 AM), https://www.bloomberglaw.com/bloomberglawnews/us-law-week/XBBCKGKK000000.

[21] Michael Dreyfuss et al., *Teens Impulsively React Rather than Retreat from Threat*, 36 Developmental Neuroscience 220, 220 (2014) ("Adolescents commit more crimes per capita than children or adults in the United States and in nearly all industrialized cultures. Their proclivity toward . . . risk taking has been suggested to underlie the inflection in criminal activity observed during this time.").

8

violent behavior, Pennsylvania's legislature reasonably decided that allowing them to carry firearms in public during statewide emergencies, when emotions already run high and violence may be widespread, would pose a particular danger to public safety. That judgment reflects precisely the type of determination that led our Founders to categorically disarm other groups they deemed to be dangerous and puts Pennsylvania's statute comfortably within the Nation's historical tradition even at the "First Founding."

> **B.** *En banc* **Rehearing Is Necessary Because, Under the Proper Methodology, Pennsylvania's Statutory Scheme Is Constitutional.**

In light of this Founding-era "tradition of disarming categories of persons thought by legislatures to present a 'special danger of [firearm] misuse,'" *Range II*, 124 F.4th at 266 (Krause, J., concurring in the judgment) (quoting *United States v. Rahimi*, 602 U.S. 680, 698 (2024)), we can look to "laws 'through the end of the 19th century[,]'" *Lara II*, 125 F.4th at 441 (quoting *Bruen*, 597 U.S. at 35), to both "shed important light on the meaning of the Amendment" and "confirm [our] understanding of [its] Founding-era public meaning," *id*. Taking account of this "critical tool of constitutional interpretation," *Heller*, 544 U.S. at 605, Judge Restrepo persuasively explained in his dissent, at *Bruen*'s second step, that Pennsylvania's statutory scheme is "consistent with the principles that underpin our regulatory tradition" and therefore is constitutional, *Rahimi*, 602 U.S. at 692. Among other reasons, he observed that "at least 17 states passed laws restricting the sale of firearms to people under 21"

9

between 1856 and 1893. *See Lara II*, 125 F.4th at 454 (Restrepo, J., dissenting).

I join that conclusion and offer here some concrete examples of ways that the "how" and "why" of those historical statutes map onto Pennsylvania's.[22]

By way of background, before the Fourteenth Amendment was ratified in 1868, a number of states treated 21 as the age of majority[23] and effectively prevented, or at least hindered, "minors" from even obtaining firearms. *See, e.g.*, 1856 Ala. Laws 17; 1859 Ky. Acts 245, § 23; 1856 Tenn. Pub. Acts 92. Other states adopted similar regulations in the years immediately after ratification, *see, e.g.*, 1875 Ind. Acts 59;

---

[22] Although *Bruen* eschewed a free-standing "means-end scrutiny" or "interest-balancing inquiry" for modern-day regulations, 597 U.S. at 22, it embraced a comparative means-end analysis by directing us to look to "how" (the means) and "why" (the end) historical "regulations burden a law-abiding citizen's right to armed self-defense" and then to consider whether the "modern . . . regulation[] impose[s] a comparable burden . . . [that] is comparably justified," *id.* at 29.

[23] *See, e.g.*, *Vincent v. Rogers*, 30 Ala. 471, 473 (1857) (describing a minor as an individual "under twenty-one years of age"); *Warwick v. Cooper*, 37 Tenn. (5 Sneed) 659, 660–61 (1858) (referring to 21 as the age of majority); *Newland v. Gentry*, 57 Ky. (18 B. Mon.) 666, 671 (1857) (referring to 21 as the age of majority); 1879 Mo. Rev. Stat. § 2559 (explaining that a male is a minor until he turns 21, and a female is a minor until she turns 18).

10

1879 Mo. Rev. Stat. § 1274; 1878 Miss. Laws 175–76,[24] signaling that the generation that incorporated the Second Amendment against the states did not understand it to limit their ability to pass such regulations, *see Bruen*, 597 U.S. at 34–37 (acknowledging that historical examples from the years immediately following ratification can, in some cases, provide evidence about the public understanding of an Amendment). Indeed, a 19th-century treatise written by "the most famous" voice on the Second Amendment at the time, *Heller*, 554 U.S. at 616, explained that states "may prohibit the sale of arms to minors," Thomas M. Cooley, *Treatise on Constitutional Limitations* 740 n.4 (5th ed. 1883).

By broadly criminalizing any attempt to convey a firearm to those under the age of 21, these statutes effectively prevented young citizens not just from carrying publicly in times of emergency, but from possessing firearms at all. Thus, as to "how" these prohibitions burdened the right to bear arms, the 18th-century laws were far more onerous than Pennsylvania's, which prohibits such youth only from carrying publicly during statewide emergencies. *See* 18 Pa. Cons. Stat. §§ 6106, 6107, 6109. If the generation that incorporated the Bill of Rights against the states believed that states could constitutionally impose *more burdensome* gun regulations on this age group, *a fortiori* it would have viewed Pennsylvania's more limited prohibition as constitutional.

In terms of "why" the statutes were enacted, these Reconstruction-era laws again are comparable to

---

[24] *See also Jones v. Bonta*, 34 F.4th 704, 740 (9th Cir. 2022) (collecting statutes), *vacated on reh'g*, 47 F.4th 1124 (9th Cir. 2022).

11

Pennsylvania's statutory scheme—certainly more so than the Founding-era militia statutes on which the panel majority relied. As I discuss in greater detail in Section D, *infra*, interpersonal gun violence "was not a problem in the Founding era that warranted much attention," in large part because the firearms that our Founders possessed simply lacked the capacity of those today to inflict mass casualties in a matter of seconds.[25] By the late 19th century, however, "gun violence had emerged as a serious problem in American life."[26] This development was fueled by the mass production of firearms that began during the wave of American industrialization in the mid-19th century,[27] and it was accompanied by renewed efforts to market gun ownership to the average American consumer.[28]

---

[25] Saul Cornell, *The Right to Carry Firearms Outside of the Home: Separating Historical Myths from Historical Realities*, 39 Fordham Urb. L.J. 1695, 1713 (2012).

[26] Saul Cornell, *The Right to Regulate Arms in the Era of the Fourteenth Amendment: The Emergence of Good Cause Permit Schemes in Post-Civil War America*, 55 U.C. Davis L. Rev. Online 65, 69 (2021).

[27] James B. Jacobs and Alex Haberman, *3D-Printed Firearms, Do-It-Yourself Guns, & the Second Amendment*, 80 Law & Contemp. Probs. 129, 137–38 (2017); *see also* David Yamane, *The Sociology of U.S. Gun Culture*, 11 Sociology Compass 1, 2 (2017) ("The 19th century shift from craft to industrial production, from hand-made unique parts to machine-made interchangeable parts, dramatically increased manufacturing capacities, and gun manufacturing played a central role in this development.").

[28] *See* Pamela Haag, *The Gunning of America: Business and the Making of American Gun Culture* xvii–xxi (2016) (explaining how gun manufacturers employed new marketing

12

It was also driven by "the trauma of the [Civil War] and the enormous increase in the production of guns necessary to supply two opposing armies," which "intensified the problem posed by firearms violence and gave a new impetus to regulation."[29]

In this changed America, "interpersonal gun violence and the collective terrorist violence perpetuated by groups such as the Ku Klux Klan" replaced the "ancient fears of tyrannical Stuart monarchs and standing armies" that preoccupied the Founding generation.[30] Those same concerns about public safety apply to today's America, where increasingly deadly firearms are mass-produced at an unprecedented rate,[31] and have motivated states like Pennsylvania to regulate the ability of still-maturing young people to carry firearms.[32]

In short, both the "how" and the "why" of Pennsylvania's statute track those of its Reconstruction-era analogues in the context of "unprecedented societal concerns [and] dramatic technological changes," *Bruen*, 597 U.S. at 27;

---

strategies to create a civilian market for firearms in the 19th century).
[29] Cornell, *supra* note 26, at 69.
[30] *Id.*
[31] Glenn Thrush, *U.S. Gun Production Triples Since 2000, Fueled by Handgun Purchases*, The N.Y. Times (updated June 8, 2022), https://www.nytimes.com/2022/05/17/us/politics/gun-manufacturing-atf.html.
[32] *See, e.g.*, Brief for Illinois, et al. as Amici Curiae Supporting Appellee's Petition for Rehearing, *Lara v. Commissioner Pennsylvania State Police*, 91 F.4th 122 (3d Cir. 2024).

13

*see infra* Section D, so *en banc* rehearing would allow us not just to correct the panel's mistaken methodology, but also its mistaken result.

### C. Rehearing Should Be Granted to Give Pennsylvania the Opportunity to Make a Sufficient Historical Showing on Remand in Light of *Bruen*, *Rahimi*, and *Range II*.

Even if this mountain of historical evidence were not enough to sustain Pennsylvania's statutory scheme, we should vacate the District Court's judgment and give Appellee the opportunity to build the necessary record to support its regulation on remand. After all, this case came to us in 2021. And as our Court has recently recognized in a similarly postured case, "much has changed since then." *Pitsilides v. Barr*, No. 21-3320, 2025 WL 441757, at *3 (3d Cir. Feb. 10, 2025).

Between the District Court's judgment and our decision in *Lara II*, the Second Amendment landscape has changed dramatically. First, the Supreme Court decided *Bruen*, abrogating our prior precedent and "effect[ing] a sea change in Second Amendment law." *Id.* Second, the Supreme Court decided *Rahimi*, which clarified that whether a firearm regulation is constitutional turns on whether it "is consistent with the principles that underpin our regulatory tradition." 602 U.S. at 692. And most recently, our *en banc* Court decided *Range II* and interpreted *Bruen* and *Rahimi* in addressing an

14

as-applied challenge to the federal felon-in-possession statute. *See Range II*, 124 F.4th at 226–32.

Those "intervening developments in our Second Amendment law," we concluded, warranted remand in *Pitsilides*, another case whose history straddled *Bruen*, *Rahimi*, and *Range II*. 2025 WL 441757, at *6. This case is materially indistinguishable. Like *Pitsilides*, *Lara II* was decided on a record developed both before *Bruen* reshaped our Second Amendment jurisprudence and before *Rahimi* clarified *Bruen*'s methodology. And now with our *en banc* Court having decided *Range II* in light of those decisions, Pennsylvania should be given the opportunity to litigate this case and build a record "probative to the prevailing Second Amendment analysis." *Id*. at *8. Rehearing is necessary to maintain uniformity in our cases that predate those seminal cases.

### D. Without Rehearing, the Majority's Approach Will Leave States Powerless to Address One of Society's Most Pressing Social Concerns.

Rehearing is also needed because the panel majority failed to apply the "more nuanced approach" that *Bruen* prescribes where a statute responds to "unprecedented social concerns or dramatic technological changes" beyond our Founders' ken. 597 U.S. at 27. Pennsylvania's Uniform Firearms Act fits that bill.

Interpersonal gun violence, historians agree, was simply not a major concern for the Founding generation.[33] Because the "black powder, muzzle-loading weapons" in that era were

---

[33] Cornell, *supra* note 25, at 1713.

15

"too unreliable and took too long to load," firearms "were not the weapon of choice for those with evil intent[.]"[34] And when we consider that these were "tight-knit" rural communities where "[e]veryone knew everyone else," "word-of-mouth spread quickly," and the population "knew and agreed on what acts were . . . permitted and forbidden,"[35] it is not surprising that gun violence "simply was not a problem in the Founding era that warranted much attention and therefore produced no legislation."[36]

In today's America, by contrast—where firearms include automatic assault rifles and high-capacity magazines, and our population is mobile, diverse, and largely urban—nearly 50,000 people die from gun-related injuries each year, and over 80% of murders involve a firearm.[37] Horrific mass shootings have also become a daily occurrence, with over 500 such shootings in 2024 alone,[38] and 37 so far in less than two

---

[34] *See* Saul Cornell, *Constitutional Mischiefs and Constitutional Remedies: Making Sense of Limits on the Right to Keep and Bear Arms in the Founding Era*, 51 Fordham Urb. L. J. 25, 38 (2023).

[35] *Range v. Att'y Gen.*, 69 F.4th 96, 117 (3d Cir. 2023) (Krause, J., dissenting).

[36] Cornell, *supra* note 25, at 1713.

[37] *See, e.g.*, John Gramlich, *What the Data Says About Gun Deaths in the U.S.*, PEW Rsch. Ctr. (Apr. 26, 2023), https://www.pewresearch.org/short-reads/2023/04/26/what-the-data-says-about-gun-deaths-in-the-u-s/.

[38] *See Past Years*, Gun Violence Archive (last visited Feb. 21, 2025), https://www.gunviolencearchive.org/past-tolls.

months in 2025.[39] And as I have explained in Section A, *supra*, the phenomenon of gun violence among those between 18 and 20 presents a particularly troubling new social concern that our Founders had no reason to contemplate.

The Supreme Court anticipated this situation when it recognized in *Bruen* that "[t]he regulatory challenges posed by firearms today are not always the same as those that preoccupied the Founders in 1791 or the Reconstruction generation in 1868," and it directed that state laws "implicating unprecedented societal concerns or dramatic technological changes may require a more nuanced approach." 597 U.S. at 27. The panel majority did not heed that counsel, so considerations of federalism and comity also compel *en banc* rehearing.

\* \* \*

The Second Amendment was "intended to endure for ages to come, and consequently, to be adapted to the various crises of human affairs," *id.* at 28 (quoting *M'Culloch v. Maryland*, 17 U.S. (Wheat.) 316, 416 (1819)), not to force on modern-day legislatures the fiction that we live in 1791 or to preclude reasonable responses to problems of gun violence that were unfathomable when the Bill of Rights was ratified. And both we and the Supreme Court have held the states' understanding of the Second Amendment when they incorporated it through the Fourteenth Amendment to be relevant and part of "this Nation's historical tradition of firearm

---

[39] *See Mass Shootings in 2025*, Gun Violence Archive (last visited Feb. 26, 2025), https://www.gunviolencearchive.org/reports/mass-shooting.

17

regulation." *Bruen*, 597 U.S. at 37. The panel majority ignored this history, and our refusal to grant rehearing *en banc* and correct that error is all the more perplexing in light of our and the Supreme Court's consistent and continued reliance on it.

For all of these reasons, I respectfully dissent from the Court's denial of *en banc* rehearing and, as we are declining to correct our own error, urge the Supreme Court to do so if presented the opportunity.

18